Joseph Goudeket v. Commissioner.
Goudeket v. Commissioner
Docket No. 21139.
United States Tax Court
1950 Tax Ct. Memo LEXIS 6; 9 T.C.M. (CCH) 1170; T.C.M. (RIA) 50319; December 28, 1950
*6 Held: (1) That during the period July 1, 1943 to December 31, 1944, petitioner and his son-in-law, Manus, in good faith, intended to and did actually join together as partners in the conduct of a partnership business, under the name of Rainbow Art Co. (2) That during the calendar year 1945, petitioner, Manus, and petitioner's daughter, Minnie, in good faith, intended to and did actually join together as partners in the conduct of a partnership business under the name of Rainbow Art Co. William P. Smith, Esq., Metropolitan Bank Bldg., Washington 5, D.C., for the petitioner. John O. Durkan, Esq., for the respondent. LEECH Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves deficiencies in income tax for the calendar years 1943, 1944 and 1945, in the respective amounts of $7,813.87, $34,670.09, and $79,814.48. The contested issue is whether, during the taxable periods involved, the Rainbow Art Co. was a bona fide partnership for income tax purposes. The case was submitted on oral stipulations, oral testimony and exhibits. The stipulated facts are found as stipulated. Findings of Fact Petitioner is a resident of Huntington, *7 West Virginia. His income tax returns for the periods involved were filed with the collector of internal revenue for the district of West Virginia. Petitioner is a native of Holland who came to the United States in January 1940 and has since become a citizen. Petitioner is married and has three daughters, one of whom was married in 1940, one in 1942, and one in 1945. After being in the United States about five months, petitioner started a general export business in New York with the Dutch East Indies. He was visited by Henry P. Manus, also a native of Holland, who was then in the United States seeking a business connection here. Petitioner, not liking the outlook for his export business, in view of world conditions, discussed with Manus the possibility of their entering into some domestic business. It was agreed in October 1940 that Manus should investigate several businesses about which they received information as a result of advertising in the New York Times. One of the businesses investigated by Manus was the Rainbow Art Co., Inc., a New York corporation, which he recommended to petitioner, who made an investigation and in November 1940 acquired all the stock of that company. *8 It was agreed that Manus was to have charge of the business, and was to receive 40 per cent of the profits, with the privilege of acquiring a proportional interest at a later date. The New York corporation operated until February 1942, when the business was moved to Huntington, West Virginia, in order to be closer to the glass supply and to take advantage of what was thought to be better labor conditions. On January 20, 1942, the Rainbow Art Co., Inc. was incorporated under the laws of the State of West Virginia. Its authorized capital stock consisted of 500 shares of the par value of $10 per share. Only 100 shares were subscribed and paid for at the time of its incorporation. On January 23, 1942, the company acquired its plant site. After the incorporation of the business in West Virginia, Manus continued to have charge of the business, while petitioner handled the financial end and devoted his attention to the location and purchase of glass objects to be decorated. The Rainbow Art Co. has always been engaged exclusively in the glass decorating business. Its entire production consisted of hand-painting glass objects, fusing the painted design into the glass by slowly passing *9 the objects through a lehr at a sufficiently high temperature to accomplish this purpose. Considerable skill was required to carry out these operations. The company purchases the objects it decorates and also decorates glass objects furnished to it by others for purposes of decoration. Books containing colored plates of the finished products were distributed to its sales representatives through whom the products were sold. In November 1942, Manus married one of petitioner's daughters. Manus was subject to draft with the armed services and was summoned before the draft board. In May 1943, he was classified as 4-F and it was then decided between Manus and petitioner that they would form a partnership upon, the proportionate basis of their oral understanding when the business was first acquired. Several attempts were made to draft a partnership agreement which were unsuccessful. After July 1, 1943, they reached an oral agreement and consulted a Huntington attorney who prepared a formal partnership agreement. The agreement was made effective as of July 1, 1943, but was not executed until about the middle of July. That agreement reads as follows: "PARTNERSHIP AGREEMENT made this 1st *10 day of July, 1943, by and Between J. GOUDEKET and H. P. MANUS, of Huntington, West Virginia. "WITNESSETH: "I. "The parties hereby agree that they will become and be partners in the business of manufacturing, buying, selling and dealing in glass and chinaware in the City of Huntington, Cabell County, West Virginia, and elsewhere as they may determine. "II. "The firm name of the partnership shall be The Rainbow Art Company. "III. "The term of the partnership shall be five (5) years commencing on July 1, 1943, unless extended by mutual agreement, or sooner terminated in accordance with the provisions of this agreement. "IV. "a. The capital of the partnership shall be the sum of Twenty-five Thousand Dollars ($25,000.00), of which J. Goudeket shall contribute Fifteen Thousand Dollars ($15,000.00) and H. P. Manus shall contribute Ten Thousand Dollars ($10,000.00). Such contributions to the partnership shall be made in cash, or partly in cash and partly in property. "b. The capital of the partnership, except such part as is or may be invested in machinery, fixtures, equipment, accounts, etc. for the conduct of the partnership business, shall be deposited in the name of *11 the partnership in The First Huntington National Bank, Huntington, West Virginia, and in such other bank or banks as the partners may from time to time designate, and shall be subject to withdrawal only by check made in the name of the partnership and signed by either of the partners, or by such person or persons as they may jointly designate. "c. No partner shall, without the written consent of the other, advance any money to the partnership in excess of the amount of his aforesaid contribution to the capital thereof, but any advance that shall be made by any partner with the consent of the other shall bear interest at 6% per annum. "V. "Both of the partners shall devote all of his [their] time and attention to the business of the partnership, and neither of them during the term of the partnership shall either directly or indirectly engage in any other business without the consent of the other. "VI. "a. Full and accurate accounts of the business of the partnership shall be kept in proper books of account, which shall be open at all times to both of the partners. Such books shall be kept at the principal office of the partnership, and each partner shall cause to be entered *12 therein full and accurate accounts of all transactions in behalf of the partnership. "b. As soon as practicable after January 1st in each year of the term of the partnership a true, full and accurate account of all of the assets and liabilities of the partnership, and an operating statement, shall be prepared; the interest of each partner in the capital, net profits and other assets of the partnership shall be ascertained, and the amount of net profit actually and without contingency earned, or the amount of net loss sustained, shall thereupon be respectively credited or debited on the books of the partnership to the partners in the proportion which they have contributed to the partnership capital, but before such division of profits or losses each partner shall be credited with an amount equal to 6% of his capital contribution. There shall be charged to the expense account such salaries of the partners as they may agree upon and all other expenses, losses and charges incident or necessary to the conduct of the partnership business. There shall be no distribution of profits except by agreement of the partners. "VII. "Each partner shall at all times pay and satisfy his own personal *13 debts and inform the other of all transactions on behalf of the partnership. Neither of the partners shall do any act or thing or enter into any agreement as a result of which anyone not a party to this agreement shall become interested with him in this partnership, nor shall either partner use the credit, money or other property of the partnership for his personal gain. "VIII. "Either partner desiring to sell all or any part of his interest in the partnership business before the end of the term herein fixed for its duration shall first give the refusal thereof to the remaining partner, and it shall be his privilege to buy the same. In no case shall a partner be permitted to sell any part of his interest to an outsider until he shall ascertain in good faith that the other partner will not pay as much as can be obtained elsewhere. "IX. "In the event of the death of a partner prior to July 1, 1948, this partnership shall terminate as of the ninetieth day following such partner's death, and as of the date of the death of the deceased partner a full and general account of the assets and liabilities of the partnership shall be taken, and after the liabilities of the partnership *14 and expenses of liquidating the same shall have been paid or payment provided for, the remaining assets and surplus shall be divided in cash or in kind between the surviving partner and the personal representative or heirs at law of the deceased partner in proportion to their respective interests in the capital of the partnership at such time. Provided, however, that the surviving partner, within sixty days after the death of the deceased partner, at his election made in writing and delivered to the personal representative or heirs at law of the deceased partner, shall have the option and privilege of purchasing the interest of the deceased partner in the partnership business as ascertained in accordance with the provisions of this paragraph, and in the event of such election on the part of the surviving partner, the ascertained value of the interest of the deceased partner shall be paid to the personal representative or heirs at law of the deceased partner in cash, or partly in cash and upon such terms and with such security as to the residue as may be agreeable to the surviving partner and the personal representative or heirs at law of the deceased partner. Should the surviving partner *15 not elect to purchase the interest of the deceased partner, then the liquidation of the partnership shall be effected as speedily as possible, and the net assets of the partnership remaining after payment of all debts and liabilities shall be divided and distributed among and to the surviving partner and the personal representative or heirs at law of the deceased partner. "X. "In determining the worth of the partnership, or the value of either partner's interest therein, the good will of the partnership business shall be valued at One Dollar ($1.00). "WITNESS the signatures and seals of J. Goudeket and H. P. Manus as of the day and year first above written. "(Signed) J. Goudeket (SEAL) "(Signed) H. P. Manus (SEAL)" In establishing the $25,000 capital provided for by the partnership agreement, the $15,000 for petitioner was paid in by a transfer from the credit balance of $16,844.04 in his personal account with the predecessor corporation, which account was assumed by the partnership in partial payment of assets transferred to the partnership, leaving a balance of $1,844.04 remaining due to petitioner. The $10,000 capital for Manus was paid in by the transfer of $1,420.63 *16 standing to his credit in his personal account with the predecessor corporation, a transfer of $7,000 to his credit from the personal account of Mrs. Goudeket with the predecessor corporation, for which amount Manus gave his promissory note, and a cash payment made by Manus on July 24, 1943 in the amount of $2,000. Capital accounts for the partners were concurrently set up on the partnership books in accordance with the foregoing and the partnership books similarly reflected the beginning of the partnership as of July 1, 1943. After the partnership was formed, petitioner and Manus devoted their full time to the business and performed the same duties they had performed for the predecessor corporation. The predecessor corporation ceased doing business as of July 1, 1943, although it was not formally dissolved until December 31, 1943. It filed its final Federal income and declared value excess-profits tax return for the calendar year 1943 on March 13, 1944. At the time the partnership of July 1, 1943 was formed petitioner held 60 per cent, and his wife, Caroline Th. Goudeket, held 40 per cent of the capital stock of the Rainbow Art Co., Inc., the predecessor corporation. Early in *17 1944, the Rainbow Art Co.'s business had increased and petitioner and Manus considered it essential to have more supervisory help in the decorating department where conditions were unsatisfactory. Between 20 and 30 women were employed in that department. Petitioner's daughter, Minnie, had worked for the predecessor corporation, both in New York and Huntington, after school hours and during vacations, without pay, and had acquired some knowledge of the business. In 1944 Minnie was a student at Marshall College. Petitioner and Manus discussed the possibility of having her enter the business. Upon the assurance that, if she made good, she would be given an interest in the business, minnie left college and worked full time in the business. Before the end of 1944 Minnie was placed in complete charge of the decorating department, the personnel of which then numbered 40 or 45. Under Minnie's supervision of the decorating department, production was stablized and there was less friction with the female employees. The results achieved were so satisfactory that petitioner and Manus decided they should assure her continued service by giving her an interest in the business. Accordingly the partnership *18 between petitioner and Manus was dissolved and a new partnership agreement was executed on December 31, 1944. This agreement provides in part as follows: "PARTNERSHIP AGREEMENT made this 31st day of December, 1944, by and between J. GOUDEKET, H. P. MANUS and MINNIE M. GOUDEKET, all of Huntington, West Virginia. "WITNESSETH: "I. "The parties hereby agree that they will become and be partners in the business of manufacturing, buying, selling and dealing in glass and chinaware in the City of Huntington, Cabell County, West Virginia, and elsewhere as they may determine. "II. "The firm name of the partnership shall be The Rainbow Art Company. "III. "The term of the partnership shall be five (5) years commencing on January 1, 1945, unless extended by mutual agreement, or sooner terminated in accordance with the provisions of this agreement. "IV. "a. The capital of the partnership shall be the sum of Fifty Thousand Dollars ($50,000.00), of which J. Goudeket and H. P. Manus shall each contribute 40% and Minnie M. Goudeket shall contribute 20%. Such contributions to the partnership shall be made in cash, or partly in cash and partly in property." * * *
The remaining *19 provisions of this partnership agreement are identical with the provisions contained in the first partnership agreement previously set forth herein. The additional $5,000 contribution to petitioner's capital account as required by the partnership agreement of December 31, 1944 was paid in by him by transfers from his personal account from the previous partnership books. Manus' additional contribution of $10,000 was paid in by him in the same manner. Minnie's capital contribution of $10,000 was paid in by a transfer to her capital account of $10,000 from petitioner's personal account on the partnership books. Minnie gave her personal note to petitioner in the amount of $10,000, which note was later paid from her share of the partnership upon the dissolution of this partnership. Capital accounts for each of the partners were concurrently set up on the books in accordance with the foregoing, and the books of account similarly reflected the beginning of the partnership entries. After Minnie was made a partner she was consulted about policy and managerial matters of the business. She had complete charge of the decorating department, the wash rooms, the operation of the lehr and the *20 inspection of the products. She assigned and supervised the decorating work, interviewed prospective employees in the decorating department, had and exercised the authority to hire and discharge such employees, to change their jobs, promote or demote them and to fix their pay. She also designed many of the patterns used on the products the company produced. Late in 1945 Minnie went to New York City for the purpose of obtaining new ideas for decorating items by attending gift shops and department stores to ascertain what was on the market. While in New York City she became engaged and was married. As her husband lived in New York City they decided to make their home there. Accordingly it was decided to dissolve the partnership as of December 31, 1945, and a formal agreement to that effect was executed by the three partners. The agreement of dissolution reads as follows: "THIS AGREEMENT, made this 31st day of December, 1945, by and between J. GOUDEKET, H. P. MANUS and MINNIE M. BROEKMAN (nee Minnie M. Goudeket). "WITNESSETH: "WHEREAS, a co-partnership has heretofore existed, and now exists, between the above mentioned parties, engaged in the glass business at Huntington, Cabell *21 County, West Virginia, under the firm name and style of The Rainbow Art Company, and "WHEREAS, Minnie M. Broekman is desirous of withdrawing from said co-partnership, and all of the parties thereto have agreed, and do agree, that a further continuance of said co-partnership is no longer desired and that said co-partnership shall be dissolved and terminated; "NOW, THEREFORE, in consideration of One Dollar ($1.00) to each of the parties by each of the others in hand paid, the receipt whereof is hereby acknowledged, it is hereby agreed between the parties that on and after this the 31st day of December, 1945, the co-partnership of The Rainbow Art Company shall terminate and cease to exist. "It is further agreed between the parties aforesaid that such notice as may be required by law of the dissolution of said partnership shall be given and that J. Goudeket, one of the above mentioned parties, shall be, and he is hereby, authorized on and after the date hereof to collect, receive and receipt for all monies, goods and property due or accruing to said co-partnership and to discharge all obligations and liabilities thereof and perform all its unexecuted contracts. "The winding-up *22 of the affairs of the partnership shall be further conducted as follows: such net assets of the partnership as are now available shall be divided between the partners in the proportion of forty per cent (40%) each to J. Goudeket and H. P. Manus and twenty per cent (20%) to Minnie M. Broekman, and any further assets which shall remain after the payment of all of the partnership's obligations and liabilities shall be divided in like proportion. All of the expenses of the liquidation and dissolution of the partnership shall be charged to the parties hereto in the proportions to which they are entitled to share in the distribution of the net assets of the partnership. "H. P. Manus and Minnie M. Broekman hereby grant and assign to J. Goudeket the good will of said partnership business, together with the right to the said J. Goudeket to use the firm name, viz: The Rainbow Art Company; provided, however, that the said J. Goudeket shall not use the said firm name so as to make either of the said H. P. Manus or Minnie M. Broekman liable for or chargeable with any of the debts or contracts of any business hereafter conducted by him alone or by him and others under said firm name. "WITNESS *23 the signatures and seals of the said J. Goudeket, H. P. Manus and Minnie M. Broekman this the day and year first above written. "(signed) J. Goudeket (SEAL) "(signed) H. P. Manus (SEAL) "(signed) Minnie M. Broekman (SEAL)" The physical assets and liabilities of the partnership were taken over and assumed by petitioner, and by reason of his taking over the assets he contributed sufficient cash to the partnership to enable it to liquidate the other two parties' shares in cash. On December 29, 1945, a new company was incorporated under the laws of the State of West Virginia with a capital stock of $50,000, consisting of 500 shares of common stock of the value of $100 per share. Petitioner transferred the assets and liabilities acquired upon liquidation of the partnership to this corporation in exchange for its capital stock. Neither Manus nor Mrs. Broekman (nee Minnie M. Goudeket) was a stockholder in the new corporation. Manus was elected a vice-president. Manus loaned $15,000 to the new corporation and holds an option agreement givinghim the privilege, until January 2, 1951, to purchase 200 shares of the capital stock of such corporation upon the terms and conditions provided *24 therein. The partnership, consisting of petitioner and Manus, maintained a bank account in the name of the Rainbow Art Co. with the Guaranty Bank and Trust Company and The First Huntington National Bank, both of Huntington, West Virginia. On September 7, 1943 signature cards authorizing either petitioner or Manus to withdraw funds from said account were filed with The First Huntington National Bank. On September 8, 1943, signature cards were filed with the Guaranty Bank and Trust Company authorizing either petitioner or Manus to withdraw funds from the account. When the partnership of December 31, 1944 was formed, consisting of petitioner, Manus and Minnie M. Goudeket, no new signature cards were filed with either of the aforementioned banks. Minnie M. Goudeket did not draw any checks against such partnership bank accounts. She was not prohibited from drawing against such accounts in the partnership agreement, but no signature card was filed on her behalf. A certificate of assumed name, dated July 1, 1943 and sworn to on September 4, 1943, was filed with the Clerk of Cabell County, West Virginia, stating that petitioner and Manus were conducting the business of Rainbow Art Co. *25 as partners. No new certificate of assumed name was filed after the entry of Minnie M. Broekman into the partnership on January 1, 1945. In fire and other business insurance policies in effect in the latter part of 1943 and 1944, the loss, if any, was made payable to petitioner and Manus. Information was attached to the Rainbow Art Co's Federal unemployment tax return for the quarter ending September 30, 1943, advising that the company was being operated as a partnership. The monthly reports of total earnings of employees filed with the West Virginia Workmen's Compensation Department during 1943 and 1944 were executed either by petitioner or Manus as "partner." The annual West Virginia business and occupation privilege (gross sales) tax returns filed with the State Tax Commissioner by Rainbow Art Co. for the period July 1 to December 31, 1943, and for the calendar year 1944 stated that the Rainbow Art Co. was a partnership and that the partners were "Joseph Goudeket and H. P. Manus." A similar return filed for 1945 also listed Minnie M. Goudeket as one of the partners. Partnership information returns were filed in 1943, 1944 and 1945, giving the names of the partners during those respective *26 periods and the amount of their distributive shares. Individual returns were filed by the respective partners in which their distributive shares and the source thereof were reflected. In determining the deficiencies in controversy the respondent taxed the entire net income of the Rainbow Art Co. for the taxable years 1943, 1944 and 1945 to the petitioner. The petitioner and Manus did, during the period July 1, 1943 to December 31, 1944. in good faith, intend to join together as partners in the conduct of the business of the Rainbow Art Co. The petitioner, Manus and Minnie M. Goudeket did, during the calendar year 1945, in good faith, intend to join together as partners in the conduct of the business of the Rainbow Art Co. Opinion This case presents the question of the bona fides and realities for tax purposes of the family partnership arrangements under which the business known as the Rainbow Art Co. was conducted in the taxable years in question. Two distinct partnership arrangements are involved, to wit, an agreement entered into between petitioner and Manus, his son-in-law, on July 1, 1943, and dissolved on December 31, 1944, and another agreement entered into on December 31, 1944, between *27 petitioner, Manus and petitioner's daughter, Minnie M. Goudeket, which was dissolved as of December 31, 1945. The respondent has challenged the realities of these two arrangements and taxed the net income of the business to petitioner. The validity of a partnership for Federal income tax purposes is a question of fact. If, upon a consideration of all the facts, it is found that the parties in good faith intended to join together in the present conduct of the business, the validity of the partnership is to be sustained. . This record establishes that petitioner and Manus, who had been well acquainted in Holland, were refugees living in New York City. They visited together on various occasions and discussed the possibility of an association in some domestic business. Petitioner was operating a small export business which was not promising because of world conditions, and suggested that Manus investigate offers of businesses obtained through advertising in the New York Times. Manus made such investigations and finally recommended to petitioner a small corporation operating a glass decorating business on Long Island under the name *28 of the Rainbow Art Co., Inc. After making his individual investigation, petitioner decided to and did acquire, in November 1940, all the stock of such corporation. It was orally agreed that Manus should have charge of the business and was to receive 40 per cent of the profits, with an opportunity to acquire a 40 per cent interest in the business. In January 1942, for business reasons, it was decided to move the business to Huntington, West Virginia. Upon advice of counsel, the New York corporation was dissolved and the business was incorporated under the laws of West Virginia, with an authorized capital stock of 500 shares of the par value of $10 per share. Petitioner held 60 per cent of the outstanding shares and his wife 40 per cent. Manus continued in the same capacity with the new corporation. In November 1942 he married one of petitioner's daughters. Manus was drafted for military service but his status was uncertain. In May 1943 he was classified as 4-F, which he felt would enable him to continue in the business. Petitioner and Manus discussed the formation of a partnership, and about the end of June 1943 they conferred with an attorney in Huntington who prepared a partnership *29 agreement which is set forth in full in our findings of fact. The capital contribution of the partnership was to be $25,000, of which $15,000 was to be contributed by petitioner, and $10,000 by Manus. Each partner was to devote his full time to the business, and the profits and losses were to be shared in the proportion of their respective contributions. The contribution of $10,000 which Manus was required to make to the partnership capital was paid in by a transfer of $1,000 from the credit balance of his personal account with the predecessor corporation, $2,000 in cash from his own funds, and $7,000 which he borrowed from petitioner's wife, the loan being subsequently paid in full. The $15,000 capital contribution of petitioner was paid in by a transfer from his personal account with the predecessor corporation. Partnership books of account were kept and maintained in accordance with the partnership agreement. Bank accounts were maintained in two Huntington banks in the partnership name and were subject to withdrawal by either partner. A certificate of assumed name was filed with the Clerk of Cabell County stating that the Rainbow Art Co. was owned and operated by petitioner and *30 Manus as partners. Various insurance policies in effect during the period 1943 and 1944 stated that the loss, if any, was payable to petitioner and Manus doing business as the Rainbow Art Co. State and Federal tax returns required to be filed were executed by the petitioner or Manus as "partners," or conveyed the information that the Rainbow Art Co. was a partnership and that the parties were petitioner and Manus. Partnership information returns were duly filed, showing the distributive shares of the partners, and each partner reported such share on his individual income tax return. We think the evidence supports no other conclusion than that the partners under the partnership agreement really and truly intended to join together for the purpose of carrying on the business and sharing the profits or losses. The respondent makes no contention that the partnership of July 1, 1943 was a sham and a mere device for splitting income. Any such claim would be without merit, since the petitioner's interest in the predecessor corporation was only 60 per cent, while his wife held the other 40 per cent interest. The respondent's contention appears to be that there was no business purpose in changing *31 from a corporate form to a partnership, other than the avoidance of excess-profits taxes. The record, we think, clearly shows that the partnership with Manus was formed to give effect to the original understanding between them when the business was first acquired. Furthermore, it is well established that parties may conduct a business in the form they choose and are not required to select the manner of doing business that will yield the greatest revenue to the Government. The evidence fully supports the conclusion that the partnership between petitioner and Manus entered into as of July 1, 1943 was bona fide and is to be recognized for income tax purposes. The second partnership arrangement entered into on December 31, 1944, whereby petitioner's daughter, Minnie, was made a partner, requires closer scrutiny. Early in 1944, while Minnie was a student, petitioner and Manus discussed the possibility of having her enter the business and supervise the decorating department. To induce her to leave college and assure her continued services, she was promised an interest in the business if the result of her work was satisfactory. Accordingly Minnie agreed to and did enter upon her duties, *32 where she was placed in charge of the decorating department, the personnel of which consisted of female employees. Minnie's handling of that department was so satisfactory that petitioner and Manus decided to take her in partnership. Thereupon the old partnership of petitioner and Manus was dissolved as of December 31, 1944, and a new partnership was formed consisting of petitioner, Manus and Minnie. A new partnership agreement was executed similar in its provisions to the prior agreement between petitioner and Manus. The capital of this new partnership was stated to be $50,000, 40 per cent of which was to be contributed by petitioner, 40 per cent by Manus and 20 per cent by Minnie. The capital accounts of petitioner and Manus were paid by charging their personal accounts with the predecessor partnership. Minnie's contribution was paid in by a charge of $10,000 against petitioner's personal account, for which she gave her father a promissory note which was eventually paid out of her distributive share when the partnership was dissolved as of December 31, 1945. The respondent challenges the good faith of this second partnership on the additional ground that Minnie neither made an actual *33 contribution to the capital of the partnership nor performed any vital services. The record shows that after Minnie became a partner she had complete charge of the decorating department. Since the business of the company was that of decorating glass objects, it is apparent that such department performed one of the most important functions of the business. Minnie had the responsibility of securing competent employees in the decorating department; the authority to hire, discharge or promote the personnel thereof; she instructed those employees in their duties and supervised their work; inspected the glass objects prior to their decoration and after the firing process was completed; she selected the particular designs to be used in decorating the objects, as well as devising a number of the designs employed. Minnie also discussed with the other partners managerial and policy matters pertaining to the conduct of the business. The foregoing summary of the services she performed clearly demonstrates that they were vital in character. Although Minnie did not draw checks against the partnership bank accounts, the agreement of partnership did not prohibit her doing so. Her executive duties *34 did not require her to perform that function. We think the record admits of no doubt that when Minnie was taken into the partnership the parties in good faith intended to join as partners in the present conduct of the business. Moreover, we think it significant, as bearing on the good faith of the parties, that although petitioner had two other daughters, one of whom had experience in the business, no attempt was made to include them in any partnership arrangement; nor was petitioner's wife, who owned a 40 per cent interest in the predecessor corporation, included in either partnership. It seems unlikely that any camouflage arrangement would overlook such opportunity to split income. We conclude that the respondent erred in taxing all the net income of the business conducted in the name of the Rainbow Art Co. during the taxable periods involved, to petitioner. It has been stipulated into the record that petitioner is entitled to deduct expenses of operating and depreciation on an automobile used for business purposes, of the following amounts: 1942, $367.85; 1943, $348.07; 1944, $277.96; and 1945, $335.27. Effect will be given to such stipulation in the recomputation under Rule *35 50. Decision will be entered under Rule 50.